IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| FORTRESS SYSTEMS, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | 8:06CV283 |
| | ) | |
| vs. | ) | |
| | ) | |
| BANK OF THE WEST, a California | ) | MEMORANDUM OPINION |
| banking corporation, | ) | AND ORDER |
| | ) | |
| Defendant. | ) | |

On February 13, 2006, Fortress Systems, LLC ("Fortress") filed this action against the defendant, Bank of the West, in the District Court of Douglas County, Nebraska and, on March 8, 2006, filed an amended complaint. (Filing No. 1.)[1]   The First Amended Complaint alleged breach of contract (Count I), promissory estoppel (Count II), and breach of duty of good faith and fair dealing (Count III).   (Filing No. 1, Notice of Removal, Complaint and First Amended Complaint.). The Bank removed the case to this court on March 23, 2006.  (Filing No. 1, Notice of Removal.)  In response to the Bank's motion, this court granted summary judgment in favor of the Bank as to Fortress's breach of contract (Count I) and breach of duty of good faith and fair dealing (Count II) claims.  (Filing No. 63, Memorandum and Order; Motion for Reconsideration denied, Filing No. 66.)  The court conducted a jury trial in this matter November 26-30, 2007.  After four days of evidence, the jury returned answers to Special Interrogatories.  (Filing Nos. 113 and 116.)

---

[1]  Bank of the West, a California corporation doing business in Omaha, Nebraska, became the successor bank in a merger with Commercial Federal Bank.  Bank of the West admits that it assumed any potential liability in this action as part of the merger; therefore, the court will refer to "the Bank" to mean both Bank of the West and its predecessor Commercial Federal Bank.

The court has heard all the testimony and has before it all of the evidence presented in the case. Based upon the testimony and evidence presented at trial, the jury responses to the special interrogatories, and arguments of counsel, the court makes the findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

**FINDINGS OF FACT**

Fortress Systems, LLC ("Fortress"), was formed in 1994 by two brothers—Michael and Joseph Carnazzo.[2] Although Fortress initially operated as a marketing consulting company, soon after it was created operations shifted to the development and production of nutritional supplements. As part of Fortress's operations, Joseph Carnazzo invented and patented an effervescent delivery system for creatine, a dietary supplement used primarily by athletes.[3]

In 1998, Fortress began selling the patented Effervescent Creatine to college athletic departments and national professional sports teams including the Arizona Diamondbacks and the Boston Red Socks. Fortress used contract packagers to mix and package the product for the customers and also licensed the product to several companies for private labeling. As Fortress began production of the patented Effervescent Creatine products, the Carnazzos sought investors for Fortress. The Carnazzos approached the Broderick family, who invested $750,000 in Fortress in exchange for 30-32% of the shares of stock and membership on Fortress's board.

---

[2] Fortress conducted business under the trade name FSI Nutrition and is referred to in some documents and trial testimony as FSI. For this opinion, Fortress is used to reference Fortress Systems, LLC, FSI Nutrition and FSI.

[3] Joseph Carnazzo holds a doctorate in pharmacology with a clinical research background and worked for approximately ten years as a clinical research pharmacist.

By the 2001, Fortress produced a line of products including Creatine Effervescent, Neuro Edge, Vitamin Edge, Joint Edge, Phosphate Edge, Glutamine Edge, Ultra Figora Weight Loss as well as a number of private label products for several companies including their largest client, General Nutrition Company ("GNC"). (Exhibit 2.) Fortress began to experience problems with the contract packagers including packaging contaminated with water and packagers who substituted substandard raw product without notice to Fortress.

Fortress decided that to ensure quality control and profitability, it should open its own manufacturing facility that would mix and package its products. However, the Brodericks were not interested in investing further in Fortress and instead wanted to continue operations as is. The Carnazzos's accountant, Jack Lengemann, introduced the Carnazzos to John Houston.[4] Houston attempted to buy out the Brodericks by offering them $300,000 for their interest in Fortress. The Brodericks rejected the offer. The Carnazzos and Houston retained an attorney who assisted with a merger of Fortress into a company owned by John Houston. Houston and the Carnazzos then applied a Nebraska law allowing for the forced buyout of minority shareholders and bought out the Brodericks. The Brodericks were not happy about the forced buyout and the $87,526 that they received for their share of the company. On August 16, 2001, the Brodericks initiated a shareholder lawsuit requesting a temporary restraining order on behalf of themselves and Fortress Systems against Michael and Joseph Carnazzo and John Houston ("the Broderick lawsuit"). (Trial Exhibit 22.)

---

[4] At the time, Houston was the CFO of Millard Refrigeration, a large, Omaha-based company.

3

After the merger and buyout of the Brodericks was completed, Houston sought to secure financing for the new manufacturing facility.  Houston contacted a number of banks in the greater Omaha area, including US Bank.  Houston testified that initially, no banks were willing to undertake the financing.  In October 2001, a former employee of US Bank, Christy Edwards, who had worked on Fortress's loan application at US Bank, began working for the Bank.  On her first day at the Bank, Edwards arranged to have lunch with Houston.  At that lunch, Edwards indicated that the Bank was interested in making the loan that Houston requested from US Bank.

Within a few days, Edwards met with Michael and Joseph Carnazzo at the Fortress's office.  At that meeting, Joseph and Michael Carnazzo gave Edwards a tour of Fortress's current facility and a product demonstration.  Michael Carnazzo testified that he briefed  Edwards regarding the market for the patented Effervescent Creatine and other Fortress products.  Michael and Joseph Carnazzo testified that at their first meeting with Edwards, they discussed with Edwards how Houston became involved in their business through the forced buyout of the Brodericks.  Michael and Joseph Carnazzo further testified that they informed Edwards that the Brodericks were suing them and Houston. Edwards testified that there was no discussion regarding the existence of the Broderick lawsuit.

Edwards next brought her supervisor, Richard Osher, to Fortress's office to meet with Joseph Carnazzo, Michael Carnazzo and John Houston.  Michael Carnazzo testified that while he was giving Osher a tour of the manufacturing facility, Osher told him that Edwards had been recruited to join the Bank to expand their commercial business.  Joseph Carnazzo testified while Osher and Michael Carnazzo were touring the facility, he and

Edwards stayed behind in the conference room and she told him "point blank" that if Michael and he did everything she asked, Fortress would get the loan.

On October 23, 2001, Houston provided to Edwards a letter and booklet regarding Fortress. (Trial Exhibits 1 and 2.) In the letter, Houston specifically requested an equipment loan in the amount of $2.2 million and a revolving line of credit of $1.5 million. The booklet included product information, financial information on the company, and Fortress's contract with GNC. In response to Edwards's requests, Fortress subsequently provided a breakdown of current purchase orders, explanations of the pro forma financials provided in the informational booklet, and additional financial statements. (*See generally*, Trial Exhibits 10, 56, 58, 59, 60, 62, 65, and 66.) Fortress also provided copies of the lease agreement and bids for the mixing and package equipment. (Trial Exhibits 123 and 127.) Additionally, Fortress gave Edwards permission to contact its customers and provided her with names and contact information. Edwards contacted a number of Fortress's clients and confirmed the purchase orders and other supply contracts. At no time did the Bank request, nor did Fortress complete, a formal loan application. In fact, Osher testified that the Bank did not have a formal loan application form for commercial lending.

Michael Carnazzo testified that in late October 2001, Edwards requested that Fortress increase the lease term on the new building from five years to ten years. On November 6, 2001, Fortress entered into an amendment to their lease agreement extending out the leasehold five additional years. (Trial Exhibit 124.) Edwards testified that she did not tell Michael Carnazzo that Fortress had to extend the lease. However, in documents Edwards prepared for the loan committee dated October 26, 2001, she noted

that the lease term was 10 years, even though the extension was not signed until more than one week later.

Additionally, Michael Carnazzo testified that Edwards told him that in order to get the loan, Fortress needed to start spending $320,000 of its own money on the new facility because the Bank wanted Fortress to have its own capital already committed. Edwards testified that she didn't remember telling Fortress to start spending money on equipment in order to get the loan.

On October 26, 2001, Edwards prepared what the Bank called a Relationship Approval Presentation ("RAP") requesting approval of the loans to Fortress. On November 30, 2001, the Bank issued a commitment for a credit facility to Fortress consisting of $2.2 million for the build-out and a $1.0 million revolving line of credit (the "Commitment Letter," Trial Exhibit 13.) Michael Carnazzo signed the Commitment Letter on behalf of Fortress Systems on December 5, 2001. (Trial Exhibit 16.) As part of the process for closing, the Bank provided to Fortress a proposed Loan and Security Agreement. (Trial Exhibit 45.) The closing was set for December 7, 2001, but was delayed until December 10, 2001, so that Michael Carnazzo, who was traveling out of town, would have time to review the loan documents.

On December 6, 2001, Houston sent a fax outlining issues in the loan documents that to be resolved prior to the closing of the loan. (Trial Exhibit 21.) In that fax, Houston indicated that "Page 11, F. Litigation. I don't think the Broderick's lawsuit fits in this category, as it is directed against the current shareholders of [Fortress]." (Trial Exhibit 21.) Edwards testified that on that same day she learned from the Bank's legal counsel that it was representing the Brodericks in the Broderick lawsuit.

6

On December 10, 2001, Edwards and Osher informed the Carnazzos that the loan would not be made because of the Broderick lawsuit. Houston testified that he was shocked when Edwards stated she heard about the Broderick lawsuit for the first time from the Bank's attorneys. Houston testified he spoke to Edwards at least twice regarding the Broderick lawsuit and he was with Michael Carnazzo on another occasion when Michael Carnazzo discussed it with Edwards.

Michael Carnazzo and Houston testified that Edwards told them at the December 10, 2001 meeting that if Fortress could make the Brodericks' lawsuit go away or settle it in a manner that did not adversely impact the company, the Bank would close the loan. Edwards testified that she did not make such a statement because she did not have the authority to do so. Osher testified that while he had not promised Fortress that he would make the loan if the lawsuit was resolved, he did state that he would be willing to reconsider the loan if the lawsuit was resolved.

Nevertheless, Michael Carnazzo and Houston testified that based on Edwards's promise to close the loan if the lawsuit was settled, they entered into intense settlement negotiations with the Brodericks. On or about January 26, 2002, the Carnazzos, Houston and the Brodericks entered into an "Intent to Settle" in which the Brodericks would receive approximately $4 million to be paid out of royalties received by the company over a number of years. (Trial Exhibit 38.) Additionally, in order to finance the royalty payments required in the settlement, Fortress negotiated a price increase for their product with GNC. Michael Carnazzo and Houston testified that they agreed to the settlement only because they thought they had no other option or their deal with the Bank wouldn't close. The final settlement agreement was to be signed at the closing of the loan. Because the loan wasn't

made, the settlement agreement was never signed. The Broderick lawsuit eventually settled for $17,500.[5]

Houston testified that he believed that the loan would close if the Broderick lawsuit was resolved. He based this on Edwards's promise to close on the loan and on his past experiences. Houston testified that through his prior employment he worked on close to 100 other loans and all of the loans closed once a commitment letter was issued. He testified that with many of the loans there were issues that had to be resolved before the loan would close, including one loan with a legal issue, but once the issues were resolved, the loans closed.[6]

Michael Carnazzo testified that after he received the Commitment Letter he consulted with Fortress's C.P.A., Lengemann, who indicated that Fortress could start building the plant as it would get its funding. After the December 10, 2001 notification that the loan was not going to close, Lengemann indicated to Michael Carnazzo that Fortress just needed to settle the lawsuit in order to get its loan. Michael Carnazzo testified that based on Edwards's promise to close the loan if the lawsuit was resolved, he started entering into agreements on behalf of Fortress with contractors to build-out the plant. The first payment of $57,000, which was a down-payment, was made on December 14, 2001. (Trial Exhibit 138.)

---

[5] Fortress filed for Chapter 11 bankruptcy protection on June 2, 2003. The Broderick lawsuit was settled in connection with the bankruptcy action.

[6] The Bank argued that Houston had proposed some additional changes to the Loan and Security Agreement that were not resolved prior to December 10, 2001. However, Edwards testified that the only reason the loan did not close on that date was the Broderick lawsuit. Osher testified that the only reason the loan was not closed in February 2002 was Fortress's initial failure to disclose the Broderick lawsuit.

Between December 10, 2001 and February 20, 2002, Edwards continued to request financial and sales contract information from Fortress.  (*See*, Trial Exhibits 29, 30 and 31.) After receiving these documents, and the "Intent to Settle," Edwards submitted a new Executive Loan Summary and RAP dated February 5, 2002.[7]  (Trial Exhibit 43.)  Edwards testified that Osher refused to send the RAP to the Loan Committee.  On February 20, 2002, Osher and Edwards advised Fortress that it would not make the original loan. Michael Carnazzo and Houston testified that Osher offered to make a loan of 50% of the amount requested.  Michael Carnazzo and Houston testified that they declined the loan because they were concerned about committing Fortress to repay a loan that would not cover the costs associated with the manufacturing facility build-out and the Broderick lawsuit settlement.  Edwards testified that the offer to make the smaller loan was made, but that it was not made a serious offer and that Osher was making a humorous comment when he made it.  Contrary to the testimony of Edwards, Michael Carnazzo and Houston, Osher did not remember the February 2002 meeting and testified that he did not recall offering the smaller loan.

Houston testified that after the February 20, 2002 meeting, Fortress attempted to seek new funding but it was too late as the first GNC product was due.  Houston testified that if he had known in December that the loan was not going to be made, he could have approached other banks to finance the manufacturing facility build-out.[8] However, Fortress

---

[7]  The document is dated 2003; however, Edwards testified that the written date is incorrect and that it was submitted in 2002.

[8]  Houston testified that Fortress did subsequently receive a loan from Oakland State Bank but that it was later and for a significantly lower amount.

did not present any evidence from any lending institution that it would have loaned money to Fortress had they been approached in December 2001.

At trial, Fortress offered the testimony of Luke Northall, a certified public account, as an expert regarding Fortress's damages due to the Bank's failure to make the loan. After his testimony, the court determined Northall's testimony applied only to lost profits, and since "benefit of the bargain" damages are not the proper measure of damages in a promissory estoppel case, the court struck the expert's testimony and it was not considered by the jury. At the close of Fortress's evidence, the Bank moved for a directed verdict, which was denied by the court. The jury was provided Special Interrogatories. The interrogatories and answers were as follows:

1.    Do you find that, on or after December 10, 2001, Bank of the West promised Fortress Systems that it would loan money to Fortress Systems?

      Jury Response:      Yes

2.    Do you find that Bank of the West reasonably expected or should have expected that its course of conduct would induce Fortress Systems to act in reliance on the conduct?

      Jury Response:      Yes

3.    Do you find that Fortress Systems acted in reliance on the conduct?

      Jury Response:      Yes

4.    Do you find that it was reasonable for Fortress Systems to rely on and act upon the Bank of the West's conduct?

      Jury Response:      Yes

5.    Do you find that Fortress Systems suffered damages proximately caused by its reliance on Bank of the West's conduct?

Jury Response:      Yes.

6.      What is the amount of the damages, if any, proximately caused by Fortress System's reliance on Bank of the West's conduct, that Fortress Systems sustained from November 30, 2001, to December 10, 2001?

Jury Response:      $0.00

7.      What is the amount of damages, if any, proximately caused by Fortress System's reliance on Bank of the West's conduct, that Fortress Systems sustained from December 10, 2001, to February 20, 2002?

Jury Response:      $2,200,000.00

8.      What is the amount of damages, if any proximately caused by Fortress System's reliance on Bank of the West's conduct between December 10, 2001, to February 20, 2002, that Fortress Systems sustained for a reasonable time thereafter?

Jury Response:      $13,326,791.00

The court inquired of the jury the methodology used to establish each dollar amount and then released the jury.

**CONCLUSIONS OF LAW**

*1.      Promissory Estoppel*

Recovery on a theory of promissory estoppel is based upon the principle that injustice can be avoided only by enforcement of a promise. *Blinn v. Beatrice Community Hospital and Health Center*, 708 N.W.2d 235, 246 (Neb. 2006) (*citing Folgers Architects v. Kerns*, 633 N.W.2d 114 (Neb. 2001). The Nebraska Supreme Court has adopted the Restatement (Second) of Contracts § 90 at 242 (1981) definition of "promissory estoppel" which provides "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such

11

action or forbearance is binding if injustice can be avoided only by enforcement of the promise." See *Rosnick v. Dinsmore*, 457 N.W.2d 793 (Neb.1990); *168th & Dodge et al. v. Rave Reviews Cinemas, LLC*, 501 F.3d 945, 955 (8th Cir. 2007).

Under Nebraska law, the doctrine of promissory estoppel does not require that the promise giving rise to the cause of action must meet the requirements of an offer that would ripen into a contract if accepted by promisee. *Blinn*, 708 N.W.2d at 247. There is no requirement of "definiteness" in an action based upon promissory estoppel. *Id.* (citations omitted.) Instead of requiring reasonable definiteness, promissory estoppel requires only that reliance be reasonable and foreseeable. *Id.*

A statement of opinion or future intent is insufficient to give rise to a promise. *168th & Dodge,* 501 F.3d at 955 (citations omitted). In addition, "'[p]romissory estoppel cannot be based on preliminary negotiations and discussions or an agreement to negotiate the terms of a contract.'" *Id.* In *168th & Dodge*, the plaintiff entered into a letter of intent regarding the lease of a movie theater to the defendant. *Id.* at 949. The court held that the letter of intent was not a sufficient promise because under Nebraska law "promissory estoppel cannot be based on the parties' agreement to negotiate the terms of the lease agreement." *Id.* at 957-58.

The Bank argues that the Commitment Letter in this case is analogous to the letter of intent in *168th & Dodge*. While the Commitment Letter is factually similar, this case presents the court with the one element missing in *168th & Dodge* - a promise. The Nebraska Supreme Court has held that a bank can be liable under a promissory estoppel theory for promising to lend money to a customer who begins construction based on the promise that the loan will be made. *Whorley v. First Westside Bank*, 485 N.W.2d 578, 582

(Neb. 1992). While the Commitment Letter may not be sufficient under its own terms to constitute a promise under promissory estoppel, there is evidence that at the December 10, 2001 meeting, or at sometime thereafter, Edwards affirmatively promised on behalf of the Bank to close the loan if the Broderick lawsuit was resolved.

Both Michael Carnazzo and Houston testified that Edwards, on behalf of the Bank, promised to close the loan once the Broderick litigation was resolved. Their attempts to quickly resolve the lawsuit, and paying a premium price to do so, corroborate their testimony that they believed the loan would close if the lawsuit was resolved. Edwards testified that she never promised that the loan would be made if the lawsuit was settled. Edwards did testify that she continued to communicate with Fortress trying to get the deal done, however, that Osher had made it clear to her that the Bank would not move forward until either the lawsuit had settled or there was some type of resolution to the issue. Osher testified that he did not promise to close on the loan once the Broderick lawsuit was resolved; he only agreed to reconsider making the loan. This created a genuine issue of fact as to whether a promise was made, and the jury believed Fortress's testimony on this issue.

Promissory estoppel also requires that the promisee's reliance on the promise be reasonable and foreseeable. *Rosnick*, 457 N.W.2d at 800. The Bank argues that as a matter of law Fortress could not rely on Edwards's promise that the Bank would make the loan because Houston is a sophisticated business person who should know that Edwards did not have authority to bind the Bank. However, the evidence presented created a factual question regarding the extent of Edwards's authority. Apparent or ostensible authority "may be conferred if the alleged principal affirmatively, intentionally, or by lack of

13

ordinary care causes third persons to act upon the apparent authority." *Double K., Inc., v. Scottsdale Ins. Co.*, 515 N.W.2d 416, 421 (citing *Corman v. Musselman*, 232 Neb. 159, 167, 439 N.W.2d 781, 787 (1989). Michael Carnazzo testified that Edwards introduced herself as a vice-president of the Bank and made statements that if Fortress did everything she asked the loan would close. Edwards testified that she does not remember giving the Carnazzos her title or, if she did, what title she gave them. Michael Carnazzo testified that Osher indicated to Fortress that Edwards, as an agent of the Bank, had the ability to close the loan. Moreover, Osher testified that Edwards had actual authority to sign the Commitment Letter. The jury determined, inherent in their other findings, that Edwards had authority to bind the Bank with her promises. The reasonableness of reliance on the promise and subsequent reassurances is an issue for a jury to determine. *Rosnick*, 457 N.W.2d at 800.

Additionally, the Bank argues that Fortress is a sophisticated business charged with the knowledge of the statutory requirement that contracts that cannot be completed in one year must be in a writing signed by the party to be charged. *168th & Dodge*, 501 F.3d at 957 (holding that sophisticated business entities are charged with the knowledge of the statutory requirement that leases be in writing); *Abboud v. Michals*, 457 N.W.2d 34 (Neb. 1992) (finding no reasonable reliance in a claim for fraudulent misrepresentation where licensed real estate agents and brokers knew that contracts for commission must be in writing under state law).

Unlike the parties in *168th & Dodge* and *Abboud*, Fortress provided evidence that negates the presumption that experienced business people are charged with the knowledge of the statutory requirement - namely, testimony of common practice in the

14

industry: that when contingencies arise after loan commitment letters are issued, those loans close as soon as the contingencies are removed.  Houston specifically testified that based on his experience that once a commitment letter was issued banks would close the loan as long as the borrower satisfied any issues that arose during the due diligence.  Houston indicated he has worked on almost 100 loans where commitment letters were issued, and all these loans closed including one loan where there was a subsequent lawsuit.  Houston testified that he believed that if the Broderick lawsuit was resolved, the Bank would close the loan.  Additionally, Jack Lengemann, Fortress's outside C.P.A., testified that he told Michael Carnazzo that other loans had closed with lawsuits and that once the Broderick lawsuit was resolved, the loan would close.  Further, Fortress's belief that the loan would close was bolstered by Edwards's continued requests for information associated with closing the loan between December 10, 2001 and February 20, 2002.

   Moreover, the Bank provided no evidence that the loan failed to close because of another contingency, or because the settlement negatively impacted Fortress's financial situation.  Osher's testimony was that the Bank ultimately decided not to fund the loan because the lawsuit had not been disclosed originally.  Therefore, the court finds that sufficient evidence existed upon which the jury could base its decision that Fortress reasonably relied on the Bank's promise to close the loan.

   Additionally, Fortress's reliance on the Bank's promises was foreseeable.  The testimony at trial showed that Edwards knew that Fortress was attempting to settle the Broderick lawsuit.  Further, Michael Carnazzo testified that he informed Edwards that construction had begun on the new building.  Michael Carnazzo testified that Edwards told him to start spending over $300,000 of Fortress's money on the build-out in order to get

the loan.  Fortress provided to the Bank copies of the bids to build-out the facilities.

Carnazzo testified that while the contracts were dated early November 2001, they did not

enter into the contracts until the end of November when Edwards initially informed Fortress

that the loan would be made.  Michael Carnazzo testified that he informed Edwards that

Fortress was starting to build-out the facility when they discussed spending the $300,000.

After the loan commitment was issued, Michael Carnazzo committed Fortress to the

agreements for the build-out of the facility.  Houston testified that he had instructed

Carnazzo not to commit Fortress to these loans until the loan closing.  However, in later

testimony, he opined that he could understand Carnazzo's decision.  The jury determined

that the Bank expected or should have expected that its course of conduct would induce

Fortress Systems to act in reliance on the conduct.

Thus, Fortress presented to the jury sufficient evidence for a finding that the Bank

made a promise to Fortress to close the loan if the Broderick lawsuit was resolved without

an adverse financial impact, that Fortress reasonably relied on this promise to its detriment,

and that this reliance was foreseeable.

### 2.    Statute of Frauds

The statute of frauds may bar a plaintiff's claim for promissory estoppel, *168th &*

*Dodge,* 501 F.3d at 955 (*citing Farmland Serv. Coop., Inc., v. Klein*, 244 N.W.2d 86, 89

(Neb. 1976)).  The Bank argues that pursuant to Neb. Rev. Stat. § 45-1,113[9], any promise

made by Edwards to loan money must be in writing.  Fortress would like the court to limit

---

[9] "A debtor or a creditor may not maintain an action or assert a defense in an action based on a credit agreement unless the credit agreement is in writing, expresses consideration, sets forth the relevant terms and conditions of the credit agreement, and is signed by the creditor and by the debtor."  Neb. Rev. Stat § 45-1,113.   Further, Neb. Rev. Stat. § 36-202 provides that oral agreement that, by its terms, is not to be performed within one year from its making, is void.  The same analysis applies regardless of which statute is applied; thus, the court will conduct only one analysis.

the analysis to whether the promise to close the loan could occur within one year, rather than the fact that the loan would be a multi-year credit agreement that would clearly fall within Neb. Rev. Stat. § 45-1,113.  The court finds no merit to Fortress's argument.

Fortress argues in the alternative that the Commitment Letter and other documents provided by the Bank provide the relevant terms and conditions to satisfy the statute of frauds.  The Bank argues that the Commitment Letter, by its own limiting terms, cannot provide the conditions and terms to satisfy the statute of frauds.  On its face, the Commitment Letter, while not a contract, was at the least a memorandum that provided all the relevant terms and conditions to make the loan. "The memorandum required by the statute of frauds must contain the essential terms of the contract." *Reifenrath v. Hansen*, 190 Neb. 58, 206 N.W.2d 42, 44 (1973).  The Restatement (Second) of Contracts § 131, provides:

> Unless additional requirements are prescribed by the particular statute, a contract within the Statute of Frauds is enforceable if it is evidenced by any writing, signed by or on behalf of the party to be charged, which
>
> (a) reasonably identifies the subject matter of the contract,
>
> (b) is sufficient to indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party, and
>
> (c) states with reasonable certainty the essential terms of the unperformed promises in the contract.

Restatement (Second) of Contracts § 131.  Further, equity will not permit the Bank to use the statute of frauds as a shield for their wrongdoing as justice requires compensation for reliance damages reasonably and foreseeably induced by promises made and broken in a business setting. *Rosnick*, 457 N.W.2d at 801. Thus, the court determines that there was sufficient writing to satisfy of the statute of frauds in this case.

3.    *Proper Measure of Damages*

Promissory estoppel only provides for damages as justice requires and does not attempt to provide the plaintiff damages based on the benefit of the bargain. *Rosnick*, 457 N.W.2d at 800. The usual measure of damages under a theory of promissory estoppel is the loss incurred by the promisee in reasonable reliance on the promise, or "reliance damages." *Id.* Reliance damages are relatively easy to determine, whereas the determination of "expectation" or "benefit of the bargain" damages available in a contract action requires more detailed proof of the terms of the contract. *Id.* The correct measure of damages is the amount expended in reasonable reliance of the promise to make a loan, not the damages had the loan been made. *Id.* at 801.

Fortress argues that it had a legal right to look to secure other funding and that it detrimentally altered its position by not seeking other loans from December 10, 2001 until February 20, 2002 based on the Bank's promises. Fortress argues that this reliance and, consequently, failure to secure another loan, entitles it to lost profits. However, as noted above, Fortress did not provide any evidence that it could have received funding from another lending institution if it had sought a loan immediately after the December 10, 2001 meeting. At most, Houston testified that he could have spoken to other lending institutions. This is a complete failure of proof on Fortress's part. Consequently, Fortress is not entitled to recover the $13,326,791 in damages as determined by the jury, as this amount clearly evidences alleged lost profits due to the failure to close the loan, not reliance damages.

Fortress also seeks to recover leasehold expenses associated with the five-year lease extension for its manufacturing facility. The court notes that the initial lease agreement was executed prior to the loan application and the extension was executed prior

18

to the loan commitment letter.  The court finds that Fortress extended this lease agreement in the hopes of obtaining the loan.  There was no reasonable reliance or forbearance by Fortress to support promissory estoppel.  Fortress additionally argues that because the Bank failed to fulfill its loan commitment, Fortress was obligated for the longer leasehold notwithstanding when it was extended.  The court notes that the landlord for the leasehold was identified in Bank records as a Fortress investor (Trial Exhibit 4, p. 3).  Additionally, the leasehold was surrendered to the landlord with the improvements for which Fortress recovers as a result of the instant order.  Finally, the landlord's recovery is limited to the difference between the lease rental rate and the rental rate on any subsequent lease.  The record is silent concerning any subsequent lease.  The record is also silent concerning any damages specifically related to the extended lease.[10]  Promissory estoppel is fundamentally an equitable remedy.  The court is not prepared to award damages for this alleged loss.

Fortress also asserts that it is entitled to recover the $325,000 spent to purchase equipment at Edwards's insistence.  Michael Carnazzo testified that the purchases were made prior to the issuance of the loan commitment letter and, therefore, Fortress cannot show that these purchases were made in reliance on the December 10, 2001 promise.  Further, because the testimony indicates that Fortress used the equipment even after the February 20, 2002 date, Fortress failed to prove it was damaged by the purchase of this equipment.

---

[10]  While not completely clear, it appears that the $3,767,000 lease was rejected in the bankruptcy proceedings and the landlord was given a $95,000 unsecured claim for all amounts due under the lease and its extension.  Trial Exhibits 124 & 210, p. 29-30. Houston and Michael Carnazzo also paid an undisclosed amount as personal guarantors. Trial Exhibit 210, *Id.*

Therefore, the court determines that the proper measure of damages is the amount spent by Fortress during the time from December 10, 2001 until February 20, 2002 in reliance that the loan would be made.  The jury determined those damages based on the evidence to total $2.2 million.[11]  The evidence before the jury is that Fortress entered into an agreement with Precision Builders for the build-out on November 29, 2001, after it was verbally notified of the loan approval.  Fortress did not pay the first installment payment until December 14, 2001, after Edwards's promise that the Bank would close the loan if the Broderick lawsuit was settled.  The jury was presented with an application for payment dated February 28, 2001, which requested $2,167,787.  (Trial Exhibit 136.)  However, as part of the bankruptcy proceedings, Fortress agreed to pay Precision Builders and Thermal Services (a subcontractor to the Precision Builders contract) a reduced amount of $1,321,695.59.[12]  Additionally, Trial Exhibit 138 shows that prior to bankruptcy, Fortress actually paid Precision Builders a total of $326,149.65.  Therefore, the total amount paid by Fortress as a result of the Precision Builders Contract was $1,647,845.24.

Therefore, the court determines that Fortress is entitled to recover on its promissory estoppel claim only the amount actually paid on the Precision Builders Contract in the amount of $1,647,845.24.

---

[11]  According to the jurors, this amount reflected the loan amount and/or amount of the Precision Builder's contract.

[12]  *In re: Fortress Systems, LLC*,  Neb. Bankr. Case No. 03-81735, Filing No. 436, Stipulation and Agreement for Settlement of Debtor's Objection to Claims of Thermal Services, Inc., Precision Builders, Inc., and Katelman Foundry, Inc.  To the extent the pleading is not part of the record in this case, the court takes judicial notice of it as public records.  *See, e.g., Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (taking judicial notice of related case).

IT IS ORDERED:

1.  The Bank of the West is liable to Fortress Systems, LLC in the amount of $1,647.845.24.

2.   A judgment in conformity with this Memorandum and Opinion and Order will issue this date.

DATED this 3rd day of January, 2008.

BY THE COURT:


s/ Joseph F. Bataillon
United States District Judge